**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>) Docket no. 2:19-cr-00176-GZS<br>NELSON DION, )<br>)<br>)<br>Defendant. )<br>) | |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Nelson Dion's Motion to Suppress (ECF No. 56). The Court held an evidentiary hearing on this Motion on March 3, 2020. Having considered the evidence and arguments before it, the Court DENIES the Motion for the reasons explained herein.

I.     **FACTUAL FINDINGS**

On March 28, 2019, Elisabeth Wheeler and Barbara Daly, two Federal Bureau of Investigation (FBI) special agents assigned to the agency's New York City field office, traveled to Nelson Dion's residence in Kittery, Maine, to interview him. Dion's ex-girlfriend had been employed at a New Hampshire business for a little over two months in 2016; law enforcement suspected that, during this period, Dion had traveled multiple times from Kittery to New Hampshire and at least once from New Hampshire to Maine with the intent to violate a protection order that prohibited his contact with her. The agents' interview was part of a criminal investigation into these suspected offenses.

The agents did not have a warrant to enter Dion's residence. They planned to introduce themselves and interview Dion under a ruse—that they were investigating a human trafficking

ring, which involved suspected prostitution activity at Dion's ex-girlfriend's New Hampshire workplace. The agents were equipped with hidden audio and video recording devices, which surreptitiously recorded their interactions at the Kittery residence on March 28, 2019. They dressed in suits, carried their duty weapons, and wore their official badges, though their weapons and badges were not visible. They used their paper credentials to introduce themselves as FBI agents.

When the agents arrived at Dion's residence in the early afternoon on March 28, they first made contact with Dion's mother, who informed them that her son was at a medical appointment. The agents left and returned about an hour and a half later, when Dion was present. As planned, they introduced themselves as FBI agents from New York who were investigating a human trafficking case. After this introduction, Dion invited them into the house to speak. Without revealing they knew Dion's ex-girlfriend had worked at the New Hampshire business, the agents told Dion that the business had been a site of prostitution connected to the human trafficking they were investigating. They told Dion they had a list of license plate numbers for vehicles that had stopped at the New Hampshire business and said they were speaking to everyone whose vehicle(s) had been identified there, to determine those individuals' reasons for visiting the business.

At first, Dion denied knowing anything about the New Hampshire business. But the agents asked him about some of his specific vehicles, and, during the conversation that followed, Dion asserted that, in 2016, his ex-girlfriend had stolen his truck and, later that year, killed herself. The agents expressed sympathy for Dion's loss. He replied, "But there was a no-contact thing, so—." The agents refocused the conversation on Dion's presence at the New Hampshire business, asserting that there were pictures of his vehicles there and that they had other records showing he had been there. The following interchange occurred:

> Agent Wheeler: -- so is there another reason that you were up there?
> Dion: No. I always take that side road all the time.
> Agent Daly: Would you have ever parked there for any reason, like make a phone call or something?
> Dion's mother: [Your ex-girlfriend] used your truck to go to work. She was working at the [New Hampshire business].
> Dion: No. I wasn't –
> Agent Daly: She was – she worked at the [New Hampshire business]?
> Dion: We weren't together.
> Agent Wheeler: Right, but we have pictures. We definitely have pictures of you getting out of your truck at that hotel, these cars here. That's why we're here, so we have to figure out the reason, and until we figure out the reason why you were at the hotel, we can't let it go. . . . You know, again, we're not looking to get anybody in trouble here for meeting girls that they had maybe thought was a date, like none of that.

(Gov't Ex. 2.)[1]

Dion denied meeting any girl at the New Hampshire business. He said he had gone there once or twice to pick an appliance out of a pile of microwaves and refrigerators that sat by a nearby dumpster. The agents told him they had seen four of his cars on surveillance video of the location. At about this point, Dion's mother reentered the conversation, and another person entered the room. The two spoke about Dion's vehicles for some time before the agents requested that they leave so the agents could talk to Dion alone.

Once Dion's mother and the other individual departed, the agents resumed their questioning, with the following exchange:

> Agent Wheeler: (Indiscernible), we just need to know. We don't care about the reason, we just need to know.
> Dion: You don't care about the reason?
> Agent Wheeler: No.
> Agent Daly: No, we don't. Our target is the individuals who are running the girls. That's literally all we care about. We're not looking to lock up anyone who used the prostitutes.

---

[1] While the Court's factual findings cite to and quote from the transcript of the March 28 interview, the Court finds that all quoted sections of the transcript reflect the audio captured in Government Exhibit 1.

3

>Dion: Okay.
>Agent Daly: Anybody who was there for drugs, you know. We picked up on a lot of stuff in and out of that hotel.
>Dion: (Indiscernible) where I had this order where I couldn't be near [my ex-girlfriend].
>Agent Daly: Okay.
>Dion: I had bumped into her at Rite-Aid one day, so I talked to her, blah, blah, blah. She said that she was working over there.
>Agent Daly: Okay.
>Dion: So once in a while I'd go over there –
>Agent Daly: Okay.
>Dion: -- and I'd see her, I'd talk to her.

(Id.)

After Dion made this admission, the agents continued to speak to him about his relationship with his ex-girlfriend and asked further questions relating to the ruse human trafficking investigation. Eventually, they elicited statements from Dion that he made the trips to New Hampshire to see his ex-girlfriend while he was residing in Maine. Soon after making these statements, Dion asked, "I'm not going to get in trouble for seeing her, am I?" The agents responded that he wouldn't, then carried on conversation. When they finally ended the interview and prepared to depart, Dion stated, "I just don't want to get in trouble for seeing her, though." Agent Daly responded, "No. I mean, that has nothing to do with this, so you know – yeah, like I said, we're not even (indiscernible) with the local, so we don't care about that."

Dion was arrested in April 2019, and he asserted his right to counsel under the Fifth Amendment to the arresting officer. On September 19, 2019, a grand jury returned an indictment charging Dion with two counts of interstate violation of a protection order, in violation of 18 U.S.C. §§ 2262(a)(1) & (b)(5).

## II. DISCUSSION

Defendant seeks to suppress the inculpatory statements he made during the ruse interview with the FBI agents; he alleges that the agents extracted these statements from him in violation of his Fourth and Fifth Amendment rights. Specifically, he argues (1) that the agents violated the Fourth Amendment by causing him to consent involuntarily to the interview at his residence and (2) that they violated the Fifth Amendment by coercing him into making involuntary inculpatory statements. Defendant's contention that, in the totality of the circumstances, the agents' deception rendered their conduct unlawfully coercive is fundamental to both arguments. The Court addresses them in turn.

### A. Defendant's Consent to Entry by the Agents into his Residence was Valid.

"[A] validly obtained and voluntary consent . . . eliminat[es] the need for a warrant." Pagán-González v. Moreno, 919 F.3d 582, 590 (1st Cir. 2019). The voluntariness of consent is evaluated in the totality of the circumstances, which includes whether the consent was obtained through trickery, deceit, or misrepresentation on the part of the government. Id. at 591. Consent is vitiated if the deception in context prevents the investigatory target from making a free and unconstrained choice to give or withhold consent.[2] Id. at 592-94.

Defendant avers that his consent to the interview was invalid because the agents misrepresented their true purpose. As he points out, courts have held consent invalid where government agents "obtain[ed] entry by misrepresenting the scope, nature or purpose of a government investigation." United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990). However,

---

[2] The First Circuit recently noted, "Although some species of deception (such as false claims of a warrant or fabricated exigencies) may vitiate consent, we are aware of no persuasive precedent establishing that an officer's strategic deployment of an empty promise, standing alone, constitutes coercion sufficient to vitiate consent in this context." Caniglia v. Strom, No. 19-1764, 2020 WL 1226491, *4 n.4 (1st Cir. Mar. 13, 2020) (internal citation omitted). In Caniglia, officers falsely promised Caniglia they would not confiscate his firearms if he consented to a psychiatric evaluation. Id.

5

Defendant's examples of such misrepresentations are all distinguishable from the scenario at hand. Several cases he cites involve agents who, after obtaining consent, acted beyond the enforcement powers they had represented themselves as having. See id. (consent to a search invalid where unannounced federal agent conducting a surreptitious criminal investigation accompanied a state official on a licensing inspection); United States v. Tweel, 550 F.2d 297, 299-300 (5th Cir. 1977) (holding that an IRS agent's deliberate misrepresentation that an investigation was civil, rather than criminal, vitiated consent); Graves v. Beto, 424 F.2d 524, 524-25 (5th Cir. 1970) (consent to blood sampling vitiated where police promised it would only be tested for blood alchohol content, but it was subject to blood-type analysis). Another case involved a ruse in which police investigating a suspect misrepresented themselves as investigating whether the suspect was a victim of identity theft. United States v. Parson, 599 F. Supp. 2d 592, 603 (W.D. Pa. 2009). Here, by contrast, the FBI agents made clear that they were conducting a criminal investigation in which Defendant was somehow implicated, not as a victim. Their representations put Defendant on fair notice that his statements, if self-incriminating as to any federal crime, could open him up to further investigation by law enforcement.[3] In the totality of the circumstances, the ruse did not operate to eliminate Defendant's free choice to demand a warrant from the agents before allowing them into

---

[3] In this manner, Dion's situation is comparable to that of the defendant in a case Dion cites, SEC v. ESM Gov't Sec., Inc., 645 F.2d 310 (5th Cir. 1981). In that case, ESM alleged that it had been affirmatively misled by an SEC agent who identified himself as an investigator seeking information about ESM for educational purposes. Id. at 311-12. ESM refused to comply with a subpoena that, it alleged, derived from the SEC agent's unlawful snooping. Id. The Fifth Circuit held that, on remand, the district court should determine whether (a) the SEC had deliberately misled ESM about its investigatory purpose, (b) ESM had actually been affirmatively misled, and (c) the contested subpoena resulted from information obtained by the SEC via its deliberate misrepresentation. Only if the court found in the affirmative for all three questions should the court decline to enforce the subpoena. Id. at 317. This Court, unable to locate the details of the case, if any, on remand, has reviewed related case law and concludes that, if the SEC agent did, in fact, disclose his identity as an investigator, ESM would almost certainly be unable on remand to prove it was actually misled. As with Defendant here, ESM would have presumably been put on notice by the disclosure that anything observed by the SEC investigator in his consensual encounters with ESM could be subject to further investigative action by the agent.

his home. His consent to their entry was therefore voluntary, and neither party contends that it was ever revoked.

### B. The Inculpatory Statements were Voluntary.

Defendant's second argument is that, in the totality of the circumstances, the agents' deceptive interview tactics coerced him into making involuntary inculpatory statements.[4] This argument, too, is misguided. Certain deceptive promises and/or interview tactics may, in the totality of the circumstances, coerce a defendant into involuntary admissions. See United States v. Flemmi, 225 F.3d 78, 91-92 (1st Cir. 2000). Determining whether they have done so entails a fact-intensive analysis into a variety of factors, including whether the government conduct at issue involved threats of retaliation or violence or "evidence of consciously misleading conduct," whether the defendant was incarcerated or under investigation when the promise was made, and the nature of the relationship between the defendant and the promising agents. See id. at 92. Promises not to use inculpatory evidence weigh especially heavily in the involuntariness analysis. See United States v. Walton, 10 F.3d 1024, 1030 (3d Cir. 1993) ("[G]iven the uniquely influential nature of a promise from a law enforcement official not to use a suspect's inculpatory statement, such a promise may be the most significant factor in assessing the voluntariness of an accused's confession in light of the totality of the circumstances."). The "defendant's attributes, such as his age, education, intelligence, and mental state," are also relevant. United States v. Hughes, 640 F.3d 428, 438 (1st Cir. 2011). In all, the critical question is whether the government conduct "actually operated to overbear the defendant's will" and thereby rendered his admission(s)

---

[4] Defendant devotes a short section of his Motion to an argument that the agents interrogated him. ECF No. 56, PageID #s 109-10. Interrogation coupled with custody triggers the need to give Miranda warnings. See Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). But Defendant does not argue that he was in custody when interrogated by the agents, and the facts do not support a sua sponte finding that he was. Therefore, the Court considers this section of Defendant's Motion only to the very limited extent that it is relevant to his involuntariness argument.

7

involuntary. United States v. Bouchard, 886 F. Supp. 121, 126 (D. Me. 1995). Here, the analysis does not indicate that, in the totality of the circumstances, Defendant's statements were coerced by the agents.

As a threshold matter, Defendant was not threatened with retaliation or violence if he chose not to answer the agents' questions. The questioning took place in the familiar location of Defendant's residence, and he was not in custody. And the tone throughout his conversation with the agents was cordial. These features of the interview weigh in favor of voluntariness. That the agents consciously misled Defendant as to their purpose, that he was under investigation at the time of the interview, and that he was not given Miranda warnings during the questioning push the scale toward involuntariness, however. See Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973) (stating that police's failure to advise defendant of his rights is relevant to the voluntariness inquiry); United States v. Boskic, 545 F.3d 69 (1st Cir. 2008) (affirming the district court's admittance of inculpatory statements obtained in a ruse immigration interview where Boskic received Miranda warnings). To aid in the proper weighing of these factors, the Court turns to United States v. Byram, 145 F.3d 405 (1st Cir. 1998), the most instructive authority for the voluntariness analysis here.

In Byram, the defendant, Herman Byram, Jr., was interviewed by a detective as part of a murder investigation. Byram, interviewed in a courthouse conference room while he awaited arraignment for a parole violation, only became talkative after the detective told him he was not "implicated in any of" the ongoing murder investigation. Id. at 406. After receiving this assurance, Byram revealed he had loaded the gun that killed the murder victim. Id. Later, when Byram was in jail for the parole violation, he was brought to testify at the murder trial; he was not advised of his right not to incriminate himself, and he testified in detail to the events surrounding the murder

and to having loaded another's gun twice during the day before the murder. Id. at 407. Since Byram was a felon, these admissions were later used to prosecute him for being a felon in possession of a firearm. Id. at 406-07. The First Circuit concluded that neither set of admissions were coerced—the police did not "threaten violence or serious retaliation if Byram refused to speak; the questioning was not prolonged; [] the atmosphere at the . . . courthouse interview" was apparently benign; and the trickery employed by the questioning detective—an assurance "literally true so far as the murder charge was concerned but a *suggestio falsi* as pertains to a possible possession charge"—would not render Byram's admissions "involuntary," even if Byram had been deceived. Id. at 408.

Here, the agents' statements to Defendant amount to the same kind of *suggestio falsi* that the First Circuit found noncoercive in Byram. Rather than explicitly promising Defendant any kind of immunity from prosecution, the interviewing FBI agents simply told him: (1) "We're not looking to get anybody in trouble here for meeting girls that they had maybe thought was a date;" (2) that they didn't care about the reason for his being at the New Hampshire business; and (3) "Our target is the individuals who are running the girls. That's literally all we care about. We're not looking to lock up anyone who used the prostitutes." These assertions do not promise Defendant anything; they simply suggest, albeit deceptively, that it doesn't matter why he was at the New Hampshire business, and they indicate that *prostitute users* are not the subject of the investigation. As in Byram, the agents assured Defendant he was not the subject of an investigation into misconduct *different from that to which he ultimately confessed*. The only statement by the agents that could amount to a concrete promise occurred when they told Defendant he would not get in trouble for seeing his ex-girlfriend. But they told him this *after* he had made the incriminating statements relevant to his prosecution for violation of a protective order. The agents'

9

lie "cannot retroactively make involuntary what" Defendant said beforehand. Cf. United States v. Jacobs, 431 F.3d 99, 111 (3d Cir. 2005) (analyzing the significance of an agent's statement to an informant suggesting he would "cover her" to the voluntariness of statements made by the informant before this suggestion). The Court therefore finds that the agents' representations amounted to *suggestio falsi*, which could not, by themselves, render Defendant's admissions involuntary.

Taking the agents' *suggestio falsi* in the totality of the circumstances, the Court cannot conclude that they "actually operated to overbear [Defendant's] will." United States v. Bouchard, 886 F. Supp. 121, 126 (D. Me. 1995). Defendant began the interview by explaining his presence at the New Hampshire business with non-inculpatory statments.[5] When pressed for further details, Defendant could have ended the interview and asked the officers to leave his residence. The features of the interview that apparently pushed Defendant to self-incriminate—namely, the agents' persistence and friendliness—did not involve the introduction of "extrinsic factors" that might conceivably distort his ability to reason and exercise his free will. See United States v. Boskic, 545 F.3d 69, 79-80 (1st Cir. 2008) (noting that, while "some types of police trickery can entail coercion," the paradigmatic example of such trickery (telling a suspect that she was in jeopardy of losing her children and welfare benefits if she did not cooperate) was characterized by the introduction of "a completely extrinsic consideration" that "cast doubt upon the reliability of the resulting confession" and "distorted [the suspect's] rational choice" (quoting Lynumn v. State, 372 U.S. 528 (1963))). Even if Defendant's personal characteristics left him more vulnerable to manipulation by law enforcement, the interview's environmental and psychological context did not demand the outcome that he volunteer self-incriminating information. The FBI agents

---

[5] Recall Defendant's assertion that he picked up discarded appliances at the location.

questioning Defendant acted with patience and cunning to create a situation in which he provided incriminating statements, but their conduct does not amount to coercion rendering his admissions involuntary.

### III.  CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (ECF No. 56) is DENIED.

SO ORDERED.

                                         /s/ George Z. Singal
                                           United States District Judge

Dated this 31st day of March, 2020.